## HEINSSEN V. STATE.

1. CONSTRUCTION OF STATUTES — LEGISLATIVE INTENT INDICATED BY CHANGE OF LANGUAGE IN AMENDMENT.— Where the language of a statute is radically changed by a subsequent amendment, such change indicates a change of intent on the part of the legislature.
2. CONSTRUCTION OF AMBIGUOUS STATUTES — LEGISLATIVE INTENT TO PREVAIL.— Although the provisions of an amendment to a law are ambiguous, it is the duty of the courts to discover, if possible, the intention of the legislature in framing the same, and to give the amended act such construction as will best effectuate the change intended.
3. AUTHORITY OF CITY COUNCIL OF DENVER TO LICENSE TIPPLING-HOUSES SUBJECT TO CONDITIONS.— The authority of the city council of the city of Denver to license, tax and regulate tippling-

houses, dram-shops, etc., is subject to the following, among other, conditions: (1) That the license rate to be charged shall not be less than certain minimum fees specified by the statute; (2) that the power granted shall only be exercised subject to the general law of the state regulating the manner of conducting the business by the licensee.

4. KEEPING OPEN TIPPLING-HOUSE ON SUNDAY — STATUTE APPLICABLE TO CITY OF DENVER UNDER PRESENT CHARTER.— By the general law of the state the keeping open of a tippling-house on the Sabbath day or night is made a criminal offense, punishable by fine or imprisonment; and the fact that such house is situate in the city of Denver will not avail as a defense under the present city charter.

5. EFFECT OF THE REPEAL OF A REPEALING ACT.— When any act or part of an act is repealed, it is not revived by a subsequent repeal of the repealing act.

6. SUSPENSION OF A GENERAL LAW BY A CITY ORDINANCE — REPEAL OF THE ORDINANCE.— When the suspension of a general law within a municipality results from a city ordinance passed in pursuance of a special charter, the repeal of the ordinance will leave the general law in force within the city.

## *Error to District Court of Arapahoe County.*

Messrs. EDGAR CAYPLESS and W. B. FELKER, for plaintiff in error.

S. W. JONES, Attorney-General, and Messrs. H. RIDDELL, I. N. STEVENS and L. C. ROCKWELL, for the state.

MR. JUSTICE HAYT delivered the opinion of the court.

Plaintiff in error, defendant below, was convicted in the district court of Arapahoe county for keeping open a tippling-house on the Sabbath day, in violation of section 151 of the Criminal Code of this state.

The place at which the act is shown to have been committed is situate within the corporate limits of the city of Denver, and the only defense relied upon is that said city, under its special charter, is excepted from the operation of the statute. The court below being of the opinion that the state law was in force within said city, the defendant was sentenced accordingly. To review this judgment the case has been brought here upon error.

The nature of the defense will more fully appear from an examination of the following provisions of the various special charters of the city of Denver, which have been in force at different times from the year 1833 to the present:

Paragraph 15, section 17, article 11, of the charter of 1883, reads as follows: " *Fifteenth.* The city council shall have exclusive power within the city to license, tax, restrain, regulate, prohibit and suppress tippling-houses, dram-shops, and the selling or giving away of any intoxicating or malt liquors, by any person within the city, except by persons duly licensed."

This provision was re-enacted without material change in 1885. See Sess. Laws 1885, p. 82. , In the Revision of 1887 the same provision was retained, with the following proviso added: " Provided, that no license shall be issued to keep any liquor saloon or dram-shop, except on petition of the owners of a majority of the real estate within the frontage of the block in which said business is to be carried on, or upon the opposite frontage. When the person applying for such license has fully complied with the laws and ordinances applying thereto, the city council shall order such license issued. No license shall be granted for a saloon or dram-shop located within one block of any church or school building." Sess. Laws 1887, p. 84.

At the next session of the legislature (1889) the section was materially amended. In this case our attention will be directed more particularly to the section as amended. It reads as follows:

" *Twelfth.* (Exclusively subject to the general law of the state, but not at a lower price than $600 to keep open until 12 o'clock, nor lower than $800 to keep open until 2 o'clock, nor lower than $1,000 to keep open all night.) To license and tax tippling-houses, dram-shops, billiard tables and bowling-alleys, and selling or giving away of any intoxicating or malt liquors by any person within the

city, and to regulate the same: *provided*, that no license shall be issued to keep any liquor saloon or dram-shop except on petition of the owners of a majority of the real estate within the frontage of the block in which said business is to be carried on. When the person ap-plying for such license has fully complied with the laws and ordinances applying thereto, the city council may order such license issued: *provided*, however, that such license may be renewed from time to time, at the discre-tion of the city council, for a period not exceeding three years, without further petition. No license shall be issued for a saloon or dram-shop located within five hun-dred feet of any church or school building; the measure-ment to be along the same street on which the church or school building fronts, and along the adjoining side streets in the case the license is sought for a dram-shop or liquor saloon on such side street." See Sess. Laws 1889, p. 126.

During all the times hereinbefore mentioned the sec-tion of the Criminal Code under which this indictment was framed has been upon our statute books. The sec-tion reads as follows:

"Sec. 151. If any person shall be guilty of open lewd-ness, or other notorious act of public indecency, tending to debauch the public morals, or shall keep open any tippling or gaming-house on the Sabbath day or night, or shall maintain or keep a lewd house or place for the practice of fornication, or shall keep a common, ill-gov-erned and disorderly house to the encouragement of idleness, gaming, drinking, fornication, or other misbe-havior, every such person shall, on conviction, be fined not exceeding $100, or imprisoned in the county jail not exceeding six months." See Gen. St. p. 331.

The only question presented for our determination upon this writ of error is, has the provision of section 151 of the Criminal Code, relating to tippling-houses, been in force within the territorial limits of the city of Denver

since the charter as amended in 1889 went into effect?
It is settled by repeated adjudications of this court that,
under the charter provision as it was framed prior to the
adoption of the amendment of 1889, the state was divested
of its control over tippling-houses within the territorial
limits of the city of Denver, the city having accepted and
exercised the exclusive powers conferred by its special
charter. The correctness of those decisions has been
vigorously assailed in argument and as strongly sup-
ported. In view of the conclusions reached upon another
branch of this case, it is unnecessary for us to follow
counsel in this discussion, as the result in this case would
not be affected by any conclusion reached thereon. There-
fore, without questioning the result announced in those
cases, we shall consider the effect of the amendment
made at the last (1889) session of the legislature. That
the phraseology of the provision has been radically
changed is conceded. The effect of such change is in
dispute.

As a preliminary observation, attention is called to the
fact that the authority of the legislative department of
the state government over the subject-matter of the pro-
vision must be conceded within constitutional limitations.
Arguments in reference to the policy and wisdom of par-
ticular laws are properly made to that department, and
not to the judicial. As before announced by this court,
it is for the courts to declare what the law is, and not
what it ought to be.

It must be admitted in the outset that the provision of
the charter under consideration is not free from ambi-
guity. But, while the uncertainty of the language to
convey the intention of the legislature is to be regretted,
it is nevertheless the duty of the judicial department to
discover the intention of the law-making power in mak-
ing the changes, so far as such intention may be disclosed
by the application to the provision of well-settled rules
of statutory construction, and, when discovered, to so

construe the act as to effectuate the purpose of the framers thereof. In obedience to one such rule of construction, we are required to presume that the change of language made by the amendment indicates a change of intent on the part of the legislature, and consequently calls for a change of construction; and, in deference to another rule of construction, some meaning must, if possible, be given to every part of the act.

We shall not attempt to give a critical grammatical analysis of the provision, nor shall we enter into a discussion as to the arrangement and specific definitions of the words employed, which produce the obscurity and ambiguity complained of. It might be difficult to discover an excuse for the use of language in the careless and ambiguous manner in which it is employed in the section under consideration. It is sufficient to say that any attempt to transpose the words, change the punctuation, strike out or transpose the parenthetical marks, in the manner advocated by counsel, would be open to serious criticism; and we conceive that such a process would be more apt to lead us to erroneous results as to the legislative intent than the course we shall pursue. Therefore, without indulging in specific speculations, we shall undertake to derive a conclusion from the entire context of the section, in the light of the two other rules of construction above mentioned. Doing this, our conclusion is that the legislature intended to confer upon the city council of Denver the authority to license, tax and regulate tippling-houses, dram-shops, etc., and that such authority was intended to be subject to the following, among other, conditions: (1) That the license rate charged by the city council for the privilege of keeping a tippling-house should not be less than certain minimum fees specified by the statute, varying according to the time of night when the same should be required to close; and (2) that the power thus granted be exercised subject to any general law of the state regulating the manner of

conducting the business,—that is to say, there being provisions in the general law requiring tippling-houses to be closed on the Sabbath day and also on election days, while the city council may regulate the carrying on of the business in other particulars, it can take no action that shall either prevent prosecutions under such provisions or confer rights in conflict therewith.

By this construction we give some meaning to every part of the act, and we have assumed, as we may properly do, that the legislature, in making the amendment, had in view the effect given to the word "exclusive" by the prior decisions of this court.

It is urged that this court in the case of *Huffsmith v. People*, 8 Colo. 175, and also in *Rogers v. People*, 9 Colo. 450, declared that the part of the Criminal Code upon which this prosecution is based was repealed within the corporate limits of the city of Denver the moment the exclusive power given the city to regulate tippling-houses was accepted and exercised by the corporate authorities; and, consequently, that the amendment of 1889, requiring the city to exercise its power subject to the general laws of the state, does not revive the section, in view of the inhibition of section 3142, General Statutes, viz.: "No act or part of an act, repealed by another act, shall be deemed to be revived by the repeal of the repealing act." The argument derives its force entirely from the use of the word "repealed" in said opinions. If, therefore, it appears that this word, while sufficiently accurate, in view of the questions presented, was, strictly speaking, improperly used, and that when the city passed the ordinance the general law was not thereby repealed, but was, at most, suspended for the time being within the corporate limits of the city, and that the suspended statute was revived upon the repeal of the suspending act, the argument must fall.

The difference between a repealed and a suspended law is this: A repeal puts an end to the law; a suspension

holds it in abeyance.  *Brown v. Barry*, 3 Dall. 365.  That
this distinction was in the mind of the judge who wrote
the opinion in *Rogers v. People* is apparent from the fact
that the word "suspend" appears several times in the
opinion.  The question before the court in that case is
stated in this language: "Does the statute of 1885
* * *  have the effect of suspending within the cor-
porate limits of the city the operation *pro tanto* of sec-
tion 839 of the General Statutes?"  And the conclusion
is stated in this manner: "(3) As we have already seen,
the effect of this statute is simply to suspend within the
corporate limits of Denver the operation of a part of said
section 839."

The one instance in which the word "repeal" occurs
in the opinion is in the midst of an argument, where the
word "suspend" is used synonymously therewith; but
care was taken to state the question presented, and the
conclusion of the court thereon, with technical exact-
ness.  In reference to the use of the word "repeal" in
the previous case of *Huffsmith v. People*, *supra*, the lan-
guage of Paine, J., speaking for the court in *Smith v.
Hoyt*, 14 Wis. 252, is precisely in point: "It is true we
have an established rule, in the construction of statutes,
that where an act or part of an act is repealed it shall
not be deemed to be revived by the repeal of such re-
pealing act.  * * *  It is true, also, that this court
has, in speaking of the effect of the act of 1858 upon the
previously existing provisions in regard to the time to
answer, said that it repealed them so far as foreclosure
actions were concerned.  * * *  That language was
natural, in view of the questions presented in that case,
and was sufficiently accurate for the purpose of disposing
of them.  But we are of the opinion that, strictly speak-
ing, the general provision requiring defendants to an-
swer within twenty days was not repealed by the act of
1858, nor by that of 1859, allowing ninety days to defend-
ants in mortgage foreclosure cases, but that those acts

merely excepted this particular class of defendants from its operation. That being so, where the statute creating the exception is repealed, the general statute, which was in force all the time, would then be applicable to all cases according to its terms. And this would be no violation of the rule of construction, before referred to, that the repeal of a repealing act should not revive the act repealed. * * * If a proviso creating an exception to the general terms of a statute should be repealed, courts would be afterwards bound to give effect to it according to those general terms, as though the proviso had never existed; and this could not be said to revive a repealed statute. The rule against this relates to cases of absolute repeal, and not to cases where a statute is left in force, and all that is done in the way of repeal is to except certain cases from its operation. In such cases the statute does not need to be revived, for it remains in force, and, the exception being taken away, the statute is afterwards to be applied without the exception."

Our attention is called to the case of *State v. De Bar*, 58 Mo. 395. The facts in that case were very similar to those presented here. In the previous case of *State v. Clarke*, 54 Mo. 17, the court had held that a charter granting exclusive authority to the city of St. Louis repealed, by implication, the general statute of the state, etc., within the territorial limits of said city. Afterwards, upon repeal of this provision of such charter, the question arose as to whether the general law was revived within the city by such repeal, and the court, by a bare majority, held that it was *not*. In reference to this conclusion, Judge Dillon, who is perhaps the best living authority upon the law governing municipal corporations under our system of government, expresses his disapproval in this emphatic language: "This last decision seems to the author to be erroneous, on the ground that the act of 1870 did not *ipso facto* repeal the general law in the city, but such repeal, or suspension, rather, was

only effected when the city passed the ordinance. If so, a repeal of the ordinance by the council, without the act of 1874, would have left the general law of the state in force within the city, and its repeal by the act of 1874 would have precisely the same effect." 1 Dill. Mun. Corp. 115.

As the argument advanced in the opinion of the majority of the court in *State v. De Bar* does not commend itself to our judgment, we shall decline to follow the conclusion reached. In our opinion, that portion of section 151 of the Criminal Code relating to tippling-houses has never been repealed. At most, the city of Denver for a time was excepted from its operation, or it may be said this provision was suspended for a time within the territorial limits of said city. Upon the taking effect of the amendments of 1889 the suspension ceased, and the operation of the general law was restored. The judgment must therefore be affirmed.

*Affirmed.*

MR. JUSTICE ELLIOTT. In my judgment, the decision of this case should be placed upon broader and more substantial ground than is taken in the foregoing opinion. The general assembly may, undoubtedly, by special charter, confer upon the city council of Denver power by ordinance to license and regulate tippling-houses, as well as to suppress and prohibit all disorderly houses within the limits of the city. But the vital question for our determination is, May such power be made exclusive? In popular parlance, may the city council be invested with power to declare by ordinance that people may commit certain offenses with comparative impunity within the limits of the city of Denver, which, if committed outside of such limits, would subject them to indictment and punishment by heavy fines or imprisonment? In more legal phrase, may such power be so vested in the city council of Denver as to take away the power and juris-

diction of the district court to enforce the general public
law of the state within the limits of the city in relation
to certain crimes or misdemeanors, as provided by the
Criminal Code?

Important as these questions may be, when considered
in relation to the public morals and the general welfare
of the state, I shall consider them only from a legal and
constitutional stand-point, bearing in mind that my offi-
cial duties are judicial, not legislative.

The district courts of this state are invested by the con-
stitution with "original jurisdiction of all causes, both
at law and in equity." Art. 6, § 11. By section 28 of
the same article it is provided that "all laws relating to
courts shall be general and of uniform operation through-
out the state; and the organization, jurisdiction, powers,
proceedings and practice of all the courts of the same
class or grade, so far as regulated by law, and the force
and effect of the proceedings, judgments and decrees of
such courts severally, shall be uniform." Section 1 of
the Criminal Code (ch. 25, Gen. St.) reads as follows: "A
crime or misdemeanor consists in a violation of a public
law in the commission of which there shall be an union
or joint operation of act and intention, or criminal neg-
ligence." From these constitutional and legislative en-
actments it follows that, so long as section 151 of the
Criminal Code remains upon our statute books as a pub-
lic law of the state, any intentional violation of its pro-
visions is a crime or misdemeanor, and, as such, is within
the constitutional jurisdiction of the district court of the
county where the offense is committed, and that it is be-
yond the power of the general assembly to divest the dis-
trict court of such constitutional jurisdiction.

It cannot be denied that the general assembly may
confer upon the municipal authorities jurisdiction con-
current with that of the state courts over certain offenses;
but any legislative enactment which purports to make
such jurisdiction exclusive over an offense declared to be

a crime or misdemeanor by the public law of the state is repugnant to the constitution, and conveys nothing more than concurrent jurisdiction over such offense. The constitutional jurisdiction of the district courts, being general, unlimited, and uniform throughout the state, cannot be impaired by such legislation. The general assembly may repeal section 151 of the Criminal Code altogether. Thus the same would cease to be a public law of the state, and thus the power and jurisdiction of the district courts throughout the state, in relation to keeping tippling-houses open on Sunday, would cease. This, however, would be no infringement upon the uniform jurisdiction of such courts.

But it is contended that the provision of the city charter purporting to give exclusive power over tippling-houses and other kindred matters does not interfere with the uniform jurisdiction of the district courts; that it is not a law relating to such matters, nor designed to regulate their jurisdiction; that the effect of the charter provision is to suspend the operation of a certain portion of the criminal law within the city limits whenever the city council by ordinance accepts and assumes jurisdiction of the matters thus confided to its special care. This argument is ingenious, but, in view of the position taken by the party advancing it in this litigation, it cannot be accepted as ingenuous. If the provision in the charter purporting to give exclusive power to the city council in relation to tippling-houses is not designed to regulate or interfere with the jurisdiction which the district court of Arapahoe county exercises in common with that of other district courts in the state in cases of this kind, how does it happen that, in this and other cases arising under section 151 of the Criminal Code, we find the accused pleading such charter provision, and the ordinances enacted in pursuance thereof, against the jurisdiction of the Arapahoe county district court? It is not pretended that an indictment for such an offense could be quashed by such a plea in the district court of any other county.

Impressed with the importance of upholding judicial decisions as a means of giving stability to the law and security to public and private rights, I have hesitated to take the responsibility of expressing views in conflict with some of the previous decisions of this court; but the strongest necessity seems to demand such a course before we drift too far from fundamental principles. The views here expressed are not intended as a revolt against *stare decisis*, but rather as a restoration of that rule; for, while they are opposed to the doctrine announced in *Huffsmith v. People*, 8 Colo. 175, and *Rogers v. People*, 9 Colo. 450, they are nevertheless in harmony with the earlier decisions of this court, as well as the current of decisions of other appellate courts upon similar questions. An examination of the authorities will abundantly confirm this statement.

Section 12, article 6, of the constitution of Illinois, adopted in 1870, confers upon the circuit courts of that state "original jurisdiction of all causes in law and equity." Section 29 of the same article reads as follows: "All laws relating to courts shall be general, and of uniform operation; and the organization, jurisdiction, powers, proceedings and practice of all courts, of the same class or grade, so far as regulated by law, and the force and effect of the process, judgments and decrees of such courts, severally, shall be uniform."

It will be observed that sections 11 and 28 of article 6 of our constitution, adopted six years later, are in legal effect complete duplicates of the Illinois constitution, with the addition of the three words "throughout the state," which additional words only serve to emphasize the uniform construction which this provision has received from the supreme court of Illinois. No one can doubt that these provisions of the Colorado constitution were borrowed from Illinois. Hence, so far as such provisions had received a definite construction by the supreme court of Illinois prior to their adoption by this

state, it is, by a familiar rule, to be presumed that we adopted such construction with the provisions. *Stebbins v. Anthony*, 5 Colo. 348.

In the case of *People v. Rumsey*, 64 Ill. 44, it was held that an act relating to the employment of stenographic reporters in the courts of Cook county was a local or special act, and obnoxious to the constitutional provision requiring uniformity in all laws relating to courts, and that "this provision of the constitution executed itself and operated *in præsenti;*" and so the local enactment was held to have been abrogated by the adoption of the constitution. This decision was rendered in 1872. Numerous decisions of a similar kind were rendered during the years 1871, 1872 and 1873 by the Illinois supreme court.

The case of *Myers v. People*, 67 Ill. 503, was decided in 1873. It was a prosecution for the illegal selling of liquor. One of the questions considered and passed upon was whether an act purporting to invest the county courts in certain counties with exclusive jurisdiction in certain criminal cases was in conflict with section 29, article 6, of the Illinois constitution. The court held that the act "must be construed as conferring only concurrent jurisdiction;" the legislature having "no power to abridge the original jurisdiction of the circuit courts;" and also that so much of the act as attempted to restrict its application to the courts of certain counties was unconstitutional,— thus carefully preserving the jurisdiction of all the circuit courts intact and unimpaired, and also making the law uniform throughout the state. Here was a definite and clear construction of both constitutional provisions under consideration. This decision was announced three years before we borrowed the constitutional provisions from Illinois, and made them a part of our fundamental law. Certainly it cannot be maintained that the general assembly may, in a matter pertaining to the administration of a public law, such as the Crimi-

nal Code, confer exclusive power upon the city council to accomplish by mere ordinance what it cannot confer directly upon constitutional tribunals, such as county courts established throughout the state.

The case of *Siebold v. People*, 86 Ill. 33, decided in 1877, was a prosecution by indictment in the circuit court for keeping a tippling-house open on Sunday in the city of Peoria, Ill. The conviction was sustained, though the decision has no direct bearing upon the question under consideration, inasmuch as the charter of Peoria did not profess to confer upon the city authorities exclusive jurisdiction in such matters.

The case of *Hart v. People*, 89 Ill. 407, decided in 1878, is directly in point. The opinion in that case was on an appeal from a conviction in the circuit court of Jo Daviess county for keeping open a tippling-house on Sunday within the limits of the city of Galena. An effort was made to reverse the judgment on the ground that the charter of the city provided that the city council should have full and exclusive power and authority to tax, license, regulate, restrain and prohibit tippling-houses, etc., within the limits of the city. In that case, as in the one now under consideration, there was considerable controversy as to the proper construction and effect of the several charters of the city of Galena in connection with the criminal law of the state; but the court, without determining these questions, placed its decision squarely upon the ground that exclusive jurisdiction over the offense could not be conferred upon the city. The following extract from the opinion will show the views of the Illinois court:

" These are questions [referring to the construction and effect of the several charters] which we do not find it necessary to consider, as there is another ground upon which we must hold there is no exclusive power and authority over the subject-matter of this offense in the city of Galena; and that is, the operation of the constitution

of 1870. By section 29, article 6, of that constitution, 'all laws relating to courts shall be general, and of uniform operation; and the organization, jurisdiction, powers, proceedings and practice of all courts of the same class or grade, so far as regulated by law, and the force and effect of the process, judgments and decrees of such courts, severally, shall be uniform.' It is inconsistent with this section of the constitution that, after the adoption thereof, exclusive jurisdiction over this offense should be in the city of Galena, and the circuit court of Jo Daviess county not have cognizance thereof. All other circuit courts of the state have jurisdiction of this offense, when committed in the respective counties of such courts, they having cognizance thereof by indictment in such courts; and if the circuit court of Jo Daviess county be held an exception in this respect, and not to have cognizance of the offense, then its jurisdiction in this respect will be anomalous, and not uniform with that of the other circuit courts of the state. This would be inconsistent with the constitutional provision that the jurisdiction of all courts of the same class or grade shall be uniform. Any exclusive jurisdiction, then, which there may have been in the city of Galena in respect to the subject-matter of this offense, before the adoption of the present constitution, must be held as having been taken away and abrogated by the adoption of that constitution, as being inconsistent with the above-cited provision thereof."

The foregoing opinion, as well as all the Illinois decisions construing the new constitution upon this subject, appear to have been pronounced by the unanimous concurrence of the seven judges.

Before considering other authorities, let us see what the decisions of the supreme court of Colorado have been upon the subject of local and special legislation, as affecting the jurisdiction of the courts and the rights and privileges of the people. In *Paton v. People*, 1 Colo. 77, it

was held that a party might be convicted under the general law of the territory for selling liquor in quantities less than one quart, notwithstanding he had a license from an incorporated city where the offense was committed; but in that case the city was not given exclusive power over the subject.

In *Hetzer v. People*, 4 Colo. 45, a municipal license was held to be a complete protection from prosecution under the general law, the authority to license being vested exclusively in the corporate authorities; but the cause of action in the *Hetzer Case* arose, and final judgment was rendered in the district court, before the adoption of our constitution, though not reviewed in this court until afterwards.

In *Ex parte Stout*, 5 Colo. 509, decided in 1881, an act providing for a criminal court in Arapahoe county was held to be repugnant to section 28, article 6, of the constitution, and so was declared unconstitutional on the ground that it was "clearly a special or local act, applicable to the criminal court of Arapahoe county only, and wholly independent of the Lake county act in every respect." In that case, section 28, article 6, of our constitution, is spoken of as "borrowed from the constitution of 1870 of the state of Illinois;" and several Illinois decisions subsequent to 1870 are cited giving the construction to the provision as heretofore shown by this opinion. In the *Stout Case* the court also said:

"No discretion is invested in the legislature concerning the character of the law by which the organization, jurisdiction, powers, proceedings and practice of these courts shall be prescribed and regulated. The direction is peremptory that *it shall be a general law of uniform operation throughout the state.*"

In 1885 the *Lowrie Habeas Corpus Case*, 8 Colo. 499, came before this court. Lowrie had been convicted and sentenced to the penitentiary by the criminal court of Arapahoe county for the crime of grand larceny. In a

most elaborate opinion the court held the conviction void, on the ground that the prosecution was by information in the criminal court instead of indictment. Section 28, article 6, was discussed in the opinion, but the decision was based upon section 8 of the bill of rights, which provides, *inter alia*, "that, until otherwise provided by law, no person shall, for a felony, be proceeded against criminally, otherwise than by indictment;" and it was held that an act dispensing with an indictment by a grand jury in felony cases, to be constitutional, must not only be "general and of uniform operation throughout the state," as applied to "courts of the same class or grade," but that it must also be applicable to all courts having jurisdiction of felony cases. The following significant and pertinent language was used in the opinion: "Clearly, if the object of the grand jury system is to guard certain fundamental rights of every citizen of the state, it follows, according to elementary principles of construction, that the change, regulation or abolition of the system must be so made as to equally affect the whole community in respect to the same rights and immunities, under the same or similar circumstances.

"It cannot reasonably be contended that such is the effect produced by the act of February 7, 1883. The effect of such legislation to the citizen is, if he be charged with the commission of a felony or infamous crime not capital, within the jurisdiction of a criminal court, an information may be filed against him therein, upon the oath of a single informer, and he may be put upon his trial therefor; whereas, if charged with the commission of the same offense outside of such jurisdiction, or if proceedings be instituted against him within such jurisdiction, but in a district court instead of a criminal court, he would be accorded the right and privilege of having the truth of the charge investigated by a grand jury composed of his peers, before he could be put to the expense, inconvenience and disgrace of a public trial." ·

The foregoing quotations from the *Stout* and *Lowrie Cases* indicate how strictly the constitutional jurisdiction of the courts of this state has been protected from the encroachments of special and local legislation calculated to affect their uniformity; and also how jealously individual rights and privileges have been guarded by the enforcement of constitutional guaranties securing equal and impartial protection to the people of every community in respect to prosecutions for crime in every part of the state. These judicial utterances, based upon sound reason, and inspired by a conscientious regard for constitutional requirements, as well as individual rights and privileges, have an important bearing upon the cases next to be considered.

The case of *Huffsmith v. People*, 8 Colo. 175, was a conviction upon an indictment by the grand jury in the district court of Arapahoe county for the offense of keeping open a tippling-house on Sunday. Upon error in this court, it was decided that the accused was entitled to show that the house so kept was located within the corporate limits of the city of Denver; that the city had assumed jurisdiction over the entire subject pertaining to such houses, by the enactment of certain ordinances in pursuance of the charter giving the city council exclusive power within the city to license, tax, regulate, restrain, prohibit and suppress tippling-houses; and so it was held that "the amended charter of the city of Denver, and the ordinances passed thereunder, afford the defendant protection against this prosecution,"— the court declaring that the "jurisdiction of the city was exclusive as to the whole subject-matter of the offense," and also that it seemed "impossible that a concurrent jurisdiction to restrain tippling-houses can exist in the state and in the city as well. The same statute which confers upon the city exclusive control over such houses divests the state of its control over them," and also that to this extent the charter "repealed the general law by necessary implica-

tion." Evidently the idea that a portion of the Criminal
Code was suspended — not repealed — by the exclusive
clause in the charter, and that the same does not interfere
in any manner with the jurisdiction of the courts, was
not then entertained by this court.

The case of *Rogers v. People,* 9 Colo. 450, extends the
doctrine of the *Huffsmith Case* to the keeping of lewd
houses. The plaintiff in error, having been indicted for
such offense in the district court of Arapahoe county,
sought shelter under the provision of the Denver charter,
and the ordinances enacted in pursuance thereof; and
they were held available to protect the accused, and to
defeat the prosecution, in the court of last resort.

The indictments in the *Huffsmith* and *Rogers Cases*
were based upon the same statute, section 151 of the Gen-
eral Criminal Code of the state, which provides, in sub-
stance, that if any person shall be guilty of open lewd-
ness, etc., or shall keep open any tippling or gaming
house on the Sabbath day or night, or shall maintain or
keep a lewd house, etc., or shall commit certain other
offenses therein specified, such person shall, on convic-
tion, be fined not exceeding $100, or imprisoned in the
county jail not exceeding six months. This statute was
enacted prior to the adoption of the state constitution,
was continued in force by that instrument, and has re-
mained a part of the Criminal Code of Colorado ever
since the revision of 1868. As the law has existed during
all that time, punishment in case of a violation of this
statute can only be inflicted upon conviction in a court of
record upon an indictment by a grand jury of the proper
county. It requires no argument to show that the Den-
ver charter is construed by the decisions in the *Huffsmith*
and *Rogers Cases* to be a law regulating and restricting
the jurisdiction of the district court of Arapahoe county
in tippling and lewd-house cases, while it does not in any
manner affect the jurisdiction of the several district
courts in such cases elsewhere in the state. Such con-

struction, therefore, must be erroneous, because it cannot be reconciled with section 28, article 6, of the constitution, which provides that the jurisdiction " of all the courts of the same class or grade, so far as regulated by law,   *   *   *   severally, shall be uniform."

Neither the *Myers Case*, in 67 Ill., nor the *Hart Case*, in 89 Ill., nor any of the numerous cases decided by the Illinois supreme court bearing upon our borrowed provisions of her new constitution, are noticed in the opinion delivered in the *Huffsmith Case*. As none of these cases appear in the brief of the attorney-general filed in that case, I am constrained to conclude that they were overlooked by the court, and yet such conclusion seems strange; for they had been decided and published years before — the *Hart Case* six years before the *Huffsmith* decision, and the *Myers Case* three years before the adoption of our constitution. Besides, they had been frequently cited and always followed in the *nisi prius* courts of Arapahoe county until the announcement of the *Huffsmith* decision rendered them unavailing. The *Siebold Case* was noticed in the *Huffsmith* opinion, but, as we have seen, it does not bear upon the question of uniform jurisdiction. The case of *Bennett v. People*, 30 Ill. 359, was also relied on, but the opinion was rendered therein long before the adoption of the new constitution, so it furnishes no better support than the *Hetzer Case* in Colorado. The only other authorities cited in the *Huffsmith* opinion are two cases from Missouri; but, as that state has no such constitutional provision *as ours* concerning the uniform jurisdiction of courts, her judicial decisions can have no weight as against the unbroken current of unanimous decisions by the supreme court of Illinois, based squarely upon the constitutional provisions in question.

Turning to the *Rogers Case*, decided two years after the *Huffsmith Case*, we find the same dearth of authority in respect to the question under consideration. Not

a single authority is noticed or cited in the opinion bearing upon the construction of section 28, article 6, of our constitution. An able effort, however, is made to combat the construction given by the Illinois courts to that constitutional provision. It is strongly urged by the able jurist delivering the opinion in the *Rogers Case*, that "the statute conferring upon the city council of Denver exclusive authority to prohibit and suppress the evil mentioned is sanctioned by the constitution itself;" and that the charter "does not deal, nor was it intended to deal, in any manner with courts or their jurisdiction." Notwithstanding all this, the accused having challenged the jurisdiction of the court by pleading the charter and ordinances of the city against the indictment, the opinion concludes with the statement that "the plea to the indictment was good." In other words, the argument is that the granting of exclusive power to the city is equivalent to taking away the jurisdiction of the court, and yet that the charter does not deal with courts nor affect their jurisdiction. I must confess myself incapable of comprehending this logic. It is true the charter does not purport to affect the jurisdiction of *courts in general*, but it is construed by the opinion to affect the jurisdiction of *one court in particular*, and therein lies the mischief.

Some reliance is placed upon the fact that the city of Denver has a special charter; and section 13, article 14, of the constitution, is referred to in the *Rogers Case* as authorizing the organization and classification of towns and cities, and the granting of different powers and restrictions to the different classes of municipal corporations. The learned justice claims that "there is clear constitutional authority for bestowing upon one class, within certain limits, exclusive legislative control over a given subject pertaining to local self-government, while another class is allowed only concurrent power in connection therewith." But we look in vain for any consti-

stitutional provision by which municipal corporations, whether organized under special charter or by general law, may be authorized to interfere with the uniform constitutional jurisdiction of the district courts in the enforcement of the general laws of the state, civil or criminal.

In the case of *Darrow v. People*, 8 Colo. 417, it was held that the charter provision providing that each board of the city council shall be the *sole* judge of the qualifications, election and returns of its own members, deprives the court of jurisdiction in determining such matters; but this was a special provision pertaining to the organization of the council itself, and, so far as the election and returns of its own members are concerned, exclusive authority might well be thus vested in pursuance of section 12, article 7, of the constitution, which authorizes the general assembly to provide for the trial of election contests in certain cases. This view was taken in the case of *People v. Londoner*, 13 Colo. 303, but in the *Darrow Case* it seems not to have been urged in behalf of the people that the charter provision making each board the sole judge, etc., might, in certain *quo warranto* proceedings, be in contravention of the constitutional requirement concerning the uniform jurisdiction of the courts; at least, that point is not discussed in the opinion.

I shall not extend this opinion to an examination of further authorities in detail. Judge Dillon, in his standard work on Municipal Corporations, speaking of bylaws or city ordinances, says they must be reasonable and lawful, impartial, fair and general; must not contravene common right; must be consistent with the public legislative policy; and subordinate to the general laws of the state. Mr. Justice Cooley, in his able treatise on Constitutional Limitations, speaking of the suspension of general laws, says: "The legislature may suspend the operation of the general laws of the state; but when it

does so the suspension must be general, and cannot be made for individual cases or for particular localities." Page 484.

So far as we have been advised, no state, other than Illinois, has a provision corresponding to our own requiring uniformity of jurisdiction for courts of the same class or grade. But authorities are not wanting to the effect that city governments, even under most liberal charters granted by states having no such constitutional restrictions, cannot nullify the general laws of the state by the enactment of mere municipal ordinances. Missouri and Texas, and perhaps other states, without constitutional safeguards to control their legislatures and protect the equal rights of all their citizens, may be fairly claimed to allow a discrimination between their cities and rural communities in respect to the observance of some of their general criminal laws. But Indiana, Michigan, West Virginia, Arkansas, New Jersey, Georgia and North Carolina, and perhaps other states, have recorded opinions of an opposite character and tendency. *Sloan v. State,* 8 Blackf. 361; *Slaughter v. People,* 2 Doug. (Mich.) 334; *Eckhart v. State,* 5 W. Va. 515; *Reich v. State,* 53 Ga. 73; *State v. Moss,* 2 Jones (N. C.), 66; *State v. Anderson,* 40 N. J. Law, 224; *Rector v. State,* 6 Ark. 187; *State v. Devers,* 34 Ark. 189.

It is not claimed that the rule is absolute that under no circumstances may we borrow a constitutional or statutory provision from another state, and then reject the construction which the courts of the former state have previously given it; but such departure should not be made without the strongest reasons therefor. In this instance we find the Illinois construction in harmony with our own earlier decisions upon analogous subjects. It was manifestly the intention of our people, in adopting our excellent constitution, containing so many provisions against local and special legislation, and so many in favor of uniformity, to secure equality and impartiality

in the administration of the law among all classes and communities throughout the state. The construction contended for in this opinion is one step, and a long one, in the right direction. It is unfortunate that it did not meet with the unanimous approval of this court when the occasion was first presented, as it did in the courts of Illinois. Our court started aright in the *Stout Case,* recognizing the fact that the provision of section 28 of our judiciary article was borrowed from the constitution of 1870 of the state of Illinois. The same rule was recognized and extended in the *Lowrie Case,* four years later. I am aware it may be said that the *Lowrie Case* was one of felony, and that the decision turns upon the fact that the word "felony" is used in section 8 of the bill of rights; but the language which we have quoted from that opinion is equally applicable to the case under consideration. A single illustration will suffice: A person charged with an offense under section 151 of the Criminal Code, in the city of Denver, might well claim that he should be "accorded the right and privilege of having the truth of the charge investigated by a grand jury composed of his peers before he could be put to the expense, inconvenience and disgrace of a public trial." So, too, stating the illustration conversely, a person charged with committing such an offense outside of the limits of the city might well claim that he should not be subject to indictment, conviction and imprisonment so long as his fellow-citizens might commit such offenses within the limits of the city without subjecting themselves to anything more than a paltry fine, under the city ordinances. Indeed, the offense specified in the indictment in this case cannot be committed at all within the city, under the ordinances as now framed, except between the hours of midnight Saturday night and 5 o'clock Sunday morning. But it is idle to pursue these illustrations. Common fairness, common justice and common sense revolt at such inequality and such unjust

discriminations between individuals and neighboring communities in the same state. If the people desire tippling-houses kept open every day and night in the week, election days as well as Sundays; if they desire to remove all restrictions against selling liquor to Indians, children and common drunkards, as well as other people,— let the law upon these subjects be repealed, and let these privileges be extended equally to all classes and communities of our people. I know of nothing in the constitution to forbid such a course. What I am insisting upon is that such laws as we have shall be enforced by the courts throughout the state according to the uniformity rule prescribed by the constitution.

Neither the constitution nor the laws of Colorado recognize any particular form of religious faith or practice. In fact, the constitution very properly forbids any such legislation. But the constitution does guaranty the free exercise and enjoyment of religious profession and worship without discrimination, and secures the liberty of conscience to every one so far as the same is consistent with good morals and the peace and welfare of society. Our laws do not recognize Sunday as having any particular sanctity or sacredness above other days; but the law does recognize *the fact* that large numbers of our people abstain from their usual employments on Sunday, and that many of them devote the day more or less to religious worship and works of charity, while others enjoy it as a day of rest, recreation or pleasure, according to their several inclinations. Hence the law provides that public offices shall not be kept open, that courts shall not sit, except in cases of necessity, and that commercial paper shall not mature on Sunday. Provision is also made to secure peace and quiet, and to prevent dissipation and disturbance, to the end that citizens of all classes may enjoy the privileges of the day as they severally please, in an orderly manner, without trespassing upon the privileges of others. These are proper subjects of legislation, of which no one can justly complain, so

long as they bear equally upon all classes. The observance of one day in seven as a day of rest is conducive to the sanitary, moral and physical well-being of the race, as the history of the world and experience of mankind abundantly attest. It is not contended that these considerations have a controlling effect upon the construction of the constitution and laws in question, but they are persuasive in favor of accepting the construction already given by the highest court of a sister state upon the subject. So I conclude that this court should feel itself bound by that construction and interpretation of the constitution which forbids that the city of Denver should be allowed by ordinance to nullify the general laws of the state. For these reasons I concur in the conclusion announced in the opinion of Mr. Justice HAYT, that the judgment of the district court must be affirmed.

*Affirmed.*