STATE OF MINNESOTA ex rel. JOHN S. GRODE v. EDWARD R.
JOHNSTONE and Another.[1]

May 6, 1895.

Nos. 9557—(339).

**Charter of St. Paul—President of Common Council.**

*Held*, that such portion of the charter of the city of St. Paul as created
the office of president of the common council, and provided for his elec-
tion annually (Sp. Laws 1874, c. 1, subc. 3, § 3), was repealed by impli-
cation by an amendment to the charter (Sp. Laws, 1891, c. 6), and that
the office was then abolished.

**Same—Appointment of County Assessor.**

*Held*, that Sp. Laws 1875, c. 90, § 1, authorizing the appointment of a
county assessor by a board consisting of the chairman of the board of
county commissioners of Ramsey county, the county auditor, and the
president of the common council, is no part of the charter of the city of
St. Paul.

**Same.**

*Held*, that said board of appointment has consisted of the chairman
of the board of county commissioners and the county auditor since the
enactment of the charter amendment in 1891, and that the power and
right to appoint the assessor for Ramsey county devolves upon these
two officials solely.

Action in the nature of quo warranto at the relation of John S.
Grode against Edward R. Johnstone and Robert H. Seng. Judg-
ment for respondent Johnstone.

*H. W. Childs*, Attorney General, for the State.

*J. C. Michael*, for the relator.

*Chamberlain & Anderson*, for respondent Seng.

*Eller & How*, for respondent Johnstone.

COLLINS, J. This is an action in the nature of quo warranto
brought to test the right of respondent Johnstone to hold the
office of assessor for Ramsey county. The litigation is the result
of the very complicated condition of the provisions of the charter

[1] Reported in 63 N. W. 176.

of the city of St. Paul, when read in connection with other laws bearing upon and affected by such charter provisions.

Grode, the relator, claims to have been duly appointed to the office of assessor in the month of March of the present year, and to be lawfully entitled to the place. Respondent Seng makes the same claim, and was made a party to the proceeding under G. S. 1894, § 5968. Respondent Johnstone holds possession of the office by virtue of an appointment made in 1893, and insists that neither has been duly appointed as his successor. From the year 1871 the mayor of the city of St. Paul has been a member, and the chairman, of the board of county commissioners of Ramsey county. Sp. Laws 1871, c. 73, § 4. By Sp. Laws 1875, c. 90, § 1, it was enacted that the chairman of this board, the auditor of the county, together with the "president of the common council" of the city of St. Paul, should constitute a board of appointment, whose duty it was to appoint, on March 10 of that year, and on March 10 of each alternate year thereafter, some suitable person—a resident freeholder and qualified elector of said Ramsey county—as county assessor. The term of such officer was expressly fixed at two years, and until his successor is appointed and has qualified. From the year 1874 down to 1891 the common council of the city was a single body; before 1887 it was composed of aldermen elected by wards, and since 1887 by certain aldermen elected by wards and others elected at large.

By Sp. Laws 1874, c. 1, subc. 3, § 3, it was provided that at the first meeting in each year this council should elect by ballot from among its members a president and vice president. The duty of the president was to preside over all council meetings, and in the absence of the mayor from the city or in case of his inability to act, the president of the council became acting mayor. It stands unquestioned that up to the year 1891 the president elected by this council was a member of the board of appointment hereinbefore mentioned. By Sp. Laws 1891, c. 6, the body theretofore known as the "common council" was entirely abrogated, and there was substituted in its place two separate bodies, one designated the "board of aldermen," composed of one alderman elected from each ward, and the other named the "assembly," its members being nine in number elected at large from the city. These two bodies were to be known as the "common council" of the city; each was to elect its presiding officer from among its own mem-

bers; each was to meet, legislate, and transact business separately, except. as hereinafter mentioned. Before presentation to the mayor for his approval or disapproval, every order, resolution, and ordinance had to pass both branches of this local legislature, in conformity with the rules of each, and also in conformity with joint rules, authority being given in general terms to adopt joint rules. Nowhere in the statute of 1891 creating these distinct bodies as a common council were any legislative functions or powers granted, save as they acted separately, or any other functions or powers, with a single exception. In cases where, by the charter provisions, or by the laws of the state, the appointment or election of any of the city officers was vested in the common council, it was enacted that such officers should be appointed or elected by the common council as constituted; that is, the two bodies, "acting in joint session." The statute of 1891 was wholly silent as to who should preside at these joint sessions, and we look in vain for any provision in the law contemplating or authorizing, or even making necessary, sessions or meetings with a combined membership for any object or purpose whatever, with the exception referred to. We have said that the board of aldermen and the assembly elected presidents. Each of these officials presided over the meetings of the body of which he was a member. In the absence of the mayor from the city, or in case of his decease or of his inability to perform the duties of his office, the president of the board of aldermen became acting mayor, and, should he be incapacitated, the president of the assembly became acting mayor.

It will be noticed that not only had a single body known as the "common council" been legislated out of existence, and another system for local government been substituted, but that every duty devolving on the presiding officer of that body, under the provision of the charter which authorized the election of such an officer, had been conferred upon and required of one or both of the presidents of the two bodies constituting, not jointly, but in separate and independent spheres, the newly-created common council. And it is undisputed that of all the duties which had from time to time been imposed on the president of the common council, as that body had formerly been constituted, by virtue of other charter provisions and other laws, not a single one remained, unless

it be that in connection with his membership in the board for the appointment of a county assessor, the bone of contention in this proceeding, and, possibly, the duty of presiding over the deliberations of the two bodies when in joint session. Every other duty or power had been expressly placed elsewhere, so that if the office of president of the common council remained, because of a failure to repeal a part of section 3 of subchapter 3, supra, the president's only duty or right was to sit once in two years as a member of the appointing board, and, possibly, as before stated, to preside over joint sessions of the two bodies.

In the month of June, 1892, rules were adopted by the members of the board of aldermen and the assembly in joint session, which concededly still remain in force. The first of these rules was that on the second Tuesday of June of that year, and on the same day each year thereafter, these bodies should meet in joint session, and proceed to elect a presiding officer, who should "be the president of the common council," and should hold his office for the term of one year. J. J. Parker, one of the assembly, was elected in June, 1894, under this rule, as we infer. John Copeland was duly elected president of the assembly about the same time. When the day arrived on which the appointing board should convene and appoint an assessor, Monday, March 11, 1895, the chairman of the board of county commissioners declined to recognize Copeland as a member of the appointing board, but did recognize Parker, while the county auditor, refusing to recognize the latter, did recognize the former, as a member of such board. Thereupon the chairman and Parker met as the board, and appointed relator, Grode, as county assessor, and the auditor and Copeland met as the board, and appointed respondent Seng to the office. We have already stated that each claims to have been duly appointed, and that respondent Johnstone refuses to acknowledge either as his successor in office. So that to determine the question we must first decide which, if either, of these two gentlemen—Parker, claiming the right to act as president of the common council, or Copeland, making the same claim because he was president of the assembly—was a member of the board of appointment, as that board was established by the law of 1875. It is obvious that, if the contention of both is without foundation, no successor to the present incumbent, Johnstone, has been elected.

Counsel for the relator are obliged to take the position that by virtue of his election by the two bodies in joint meeting in June, 1894, Parker is the president of the common council of the city, within the meaning of the charter provision which created and established that office, and prescribed the duties of the person who should be elected to the same. Sp. Laws 1874, c. 1, subc. 3, § 3. And this position is based on the proposition that such portion of this provision as created the office, and directed the manner in which an incumbent should be elected, stands unaffected and unrepealed by the 1891 legislation. We have seen that the office in question was created by express charter provision; that such officer was to be elected from among the members of a single body known as the "common council"; and that in close connection with these requirements his duties were prescribed. We have also seen that the body of which he was necessarily a member was wholly abolished, and two separate bodies substituted in place of the same; that for each of these bodies a president was to be elected, who was to perform the duties in each formerly required of the president of the abolished body; and that all other duties which rested upon this officer, with a single exception, and that certainly not strictly of a municipal character, were expressly transferred to one or the other of the new presiding officers. The logic of this condition of the charter would naturally be that all provisions creating the office, and relative to the election of such an officer, had been repealed by implication, because inconsistent with the new order of things.

But it is argued that as neither of the two bodies constituted the common council, and because it was enacted by the amendment of 1891 that these two bodies should be known as the "common council" of the city, that, taking the two together, they form a third or complete body, which is the common council. This argument has no merit. To constitute and be the common council, these two bodies must perform their duties separately, and the moment they combine their acts are not those of the common council. A third body could not be such council. The plan adopted in 1891 was patterned after the legislative department of our state government. We have a senate and a house, separate and distinct bodies, each having its duties and powers, and these two bodies are designated and known as the "legislature." But no one has ever

thought of suggesting that taking both senate and house together they formed a third and complete body, which is the legislature. It is the senate and the house, when acting independently, each body in its own sphere, which constitutes the legislature.    And it is the board of aldermen and the assembly, each meeting, acting, and voting by itself, which makes the common council of the city. That they have met collectively in joint convention or session, for a particular statutory purpose, does not change their separate and distinct composition or dual character in the least degree, nor are they, when in such convention or session, different bodies than they are when separated.    For instance, the senate and the house are authorized and required to meet in joint convention for the purpose of electing United States senators, and the board of aldermen and the assembly are authorized and required to meet in joint session to elect certain city officers, but the individuality of each body is in no wise affected by the joint proceedings.    That two of these bodies create a state legislature, and the other two create a common council, is not because, or when, the members meet and sit together. The argument of counsel for the relator amounts to saying that notwithstanding the statute of 1891 revised the subject-matter of section 3, subc. 3, supra, and of sections 1, 2, subc. 4, of the charter of 1874, and substituted a new system of local legislation, there was no repeal of that part of said section 3 which provided that "at the first meeting of the common council in each year they shall proceed to elect by ballot from their number a president and vice president," solely because joint sessions of the two bodies were required for the election of a few city officers, at which sessions a presiding officer would be necessary.    It is certain that the provisions of the 1891 act, which provided for the election of a president for each of the two bodies, and prescribed the duties of each, were clearly in hostility with all of said section 3, except the portion above quoted, and we are of the opinion that as to that they were inconsistent and repugnant.    The quoted portion was repealed by implication.    That this is the construction placed upon the legislation by the members of the board and of the assembly when they met in joint session in 1892, and that this view has since been acquiesced in, seems apparent from the adoption of and subsequent action under joint rule 1.    No such rule was required if the char-

ter provision was unrepealed.    If it was in force, the president of
the common council would be elected under the statute, not by rea-
son of a rule.    Again, there was no provision in the rule for the
election of a vice president, which was quite as much the duty and
almost as important as the election of a president.    And again, the
rule provided for the election of a presiding officer "who shall be
president of the common council," not for the election of a presi-
dent of the council who should preside over the joint sessions.    Of
course, the rule cannot be given the force of law.    It follows, from
what has been said, that Parker was not entitled to take. part in the
appointment of a county assessor.

In behalf of respondent Seng, it is urged that evidently the legis-
lature for the year 1891 did not intend to leave a vacancy in the
appointing board, and that from the wording of the amendments
to the charter its manifest purpose was to devolve upon the presi-
dent of the assembly the duty imposed on the president of the com-
mon council by the act of 1875, by means of that part of section 1
of chapter 6, supra, which reads: "And in such cases as the char-
ter of the city now provides that the president of the common coun-
cil ex officio    *    *    *    shall perform certain duties outside of leg-
islative duties such duties and powers are granted to and imposed
upon the president ex officio    *    *    *    of said assembly."    Un-
fortunately for this claim, the statute of 1875, providing for the
appointment of an assessor for the county of Ramsey, cannot be
held to be a charter provision.    The act was entitled "An act in
relation to assessments for taxes in the county of Ramsey."    It
was a county office purely which was created.    The salary of the
officer was paid by the county, his duties were coextensive with
its limits, his official bond was to the state, and was to be approved
by the board of county commissioners.    That the earlier charter
provisions relating to ward assessors for the city were expressly
repealed by the enactment of this law does not strengthen the con-
tention that it was really an amendment to, and must be regarded
as part of, the city charter.    The president of the assembly was
not a member of the board of appointment.    The appointing board
now consists of the chairman of the board of county commission-
ers and the county auditor, and on these two officials devolve the
power and right to appoint an assessor.    G. S. 1894, § 255, subd.

3.   Until this power and right are exercised, the respondent John-stone remains the county assessor, for no successor to him in the office has been appointed.

Judgment will be entered in accordance with the views herein expressed.