STATE ex rel. GEORGE T. SIMPSON v. CHARLES L. HAAS.[1]

February 11, 1910.

Nos. 16,292—(33).

**City of St. Paul — President of Common Council — Appointment of County Assessor.**

Under the charter of 1874 the common council of the city of St. Paul consisted of one legislative body, presided over by a president. By the Bell charter of 1891 a dual form of city government was substituted, consisting of two separate bodies, each presided over by a president, and the office of president of the common council was abolished. State v. Johnstone, 61 Minn. 56. By the home rule charter of 1900 the dual form of government was retained, but the office of president of the common council was restored.

Chapter 90, Sp. Laws 1875, which created a board consisting of the chairman of the board of county commissioners, the county auditor, and the president of the common council of the city of St. Paul, with the duty of appointing a county assessor for the county of Ramsey, was not amended nor in part repealed by the Bell charter, and upon the restoration of that office by the home rule charter the act of 1875 became self-operating, and the president of that body became entitled to participate as a member of the appointing board.

Upon information of the attorney general the district court for Ramsey county issued a writ of quo warranto directed to Charles L.

1Reported in 124 N. W. 983.

Haas, requiring him to show cause by what right he held the office of assessor for Ramsey county. His answer alleged that on March 10, 1909, he was duly elected by a majority of a board consisting of the chairman of the board of county commissioners, the county auditor, and the president of the common council of the city of St. Paul, pursuant to the act of 1875, and had duly qualified. The reply alleged that the office of president of the common council of the city of St. Paul was abolished on March 24, 1891, and that ever since that date the board of appointment had consisted of the chairman of the board of county commissioners and the county auditor, and these officials had the sole power to appoint the assessor. The matter was heard upon stipulated facts by Hallam, J., who made findings and ordered that the writ be discharged. From that order, plaintiff appealed. Affirmed.

*George T. Simpson,* Attorney General, *Clifford L. Hilton,* Assistant Attorney General, and *Lightner & Young,* for appellant.

The city of St. Paul could not by adopting a home rule charter in any manner change or affect the law of 1875 or its operation, the office of county assessor being a county office. Sp. Laws 1891, p. 198, c. 6, § 1, enacts "and in such cases as the charter of said city now provides that the president of the common council ex officio * * * shall perform certain duties outside of legislative duties, such duties and powers are granted to and imposed upon the president ex officio * * * of said assembly." See State v. Johnstone, 61 Minn. 56, 62, State v. Ehrmantraut, 63 Minn. 104, 109. If the legislature did not, or could not, by the act of 1891 make the president of the assembly a member of the board of appointment, how can the city of St. Paul by amending its charter change the effect of the law of 1875 so as to cut down the representative voice of the county in the selection of the county assessor? The city and its citizens acting by themselves can have no power to affect the rights of the citizens of the whole county. The repeal of the act of 1891 would not restore the original membership of the board, for it is a rule of general construction in this state that the repeal of a repealing act does not revive the original act. R. L. 1905, § 5512; G. S. 1894, § 258; Lam-

bert v. Slingerland, 25 Minn. 457, 459; State v. Village of Reads, 76 Minn. 69.

Under the constitutional amendment of 1892 it was beyond the power of the legislature, either by its own act or by delegation of power to a municipal corporation, to amend or affect the law of 1875 as it stood when this constitutional amendment was adopted.   State v. Ritt, 76 Minn. 531; Murray v. Board Commrs. of Ramsey County, 81 Minn. 359; State v. Johnson, 77 Minn. 453; Bowe v. City of St. Paul, 70 Minn. 341; State v. Copeland, 66 Minn. 315; Alexander v. City of Duluth, 57 Minn. 47.   The constitutional amendment of 1896 (art. 4, § 36) in no manner changed or affected the constitutional amendment against special legislation.   It in no manner authorized a city to change or affect a law relating to a county office. The decision of the trial court amounted to saying that what the legislature could not directly accomplish, except by repeal of the special law of 1875 and the enactment of a general law in place thereof, could be accomplished indirectly by local city organizations.

Section 571 of the home rule charter is merely the quotation of the law of 1875 without change.   The inclusion of this section in the home rule charter amounted to nothing or else it changed the law as to the election or appointment of the county assessor.   No power was delegated to the city of St. Paul under section 36 to legislate in any way, shape, or manner as to county affairs or county officers. If section 571 could change the mode of election or appointment, it might have made a more radical change; if the city of St. Paul had any such power, it was an unlimited power; if the city of St. Paul had such a power, the village of White Bear in Ramsey county has the same power, and when it frames a home rule charter it may make a different disposition of the subject.

Assuming that the home rule charter restored the office of president of the common council, this restoration was made by the home rule charter which as to the city was a general law concerning its affairs. In so restoring the office the charter contains no reference to the act of 1875, which was obviously a special act.   A law general in its terms and application does not repeal or modify a prior special law, unless the intention so to repeal or modify is made clearly apparent.

State v. Peter, 101 Minn. 462; Evans v. City of Redwood Falls, 103 Minn. 314; State v. Archibald, 43 Minn. 328; State v. Egan, 64 Minn. 331; State v. Lindquist, 77 Minn. 540; State v. Bailer, 91 Minn. 186. The general provision in the charter for the election of a president of the common council, without any reference being made to the special law of 1875, did not affect, modify, or change the law of 1875.

*Durment, Moore & Sanborn,* for respondent.

The act of 1875 creating the board has never been modified. It has continued in force as a law from its enactment to the present time, unchanged. It is true the board had not a full membership at any time from the enactment of the amended charter of 1891 to the adoption of the home rule charter in 1898; but that was because the charter of St. Paul had been changed so as to abolish the office of president of the common council, and not because of any change in the act of 1875. The act of 1875 could not operate on the president of the common council because the office had been abolished; but it continued in force as a law, and now operates on the revived office of president of the common council.

LEWIS, J.

Proceedings in quo warranto for the purpose of testing the right of respondent to the office of assessor of Ramsey county. The sole question is whether H. G. Haas, as president of the common council of the city of St. Paul, was a member of the appointing board, provided by chapter 90, Sp. Laws 1875, and had the right to participate in the appointment.

From 1874 to 1891 the common council of St. Paul consisted of a single body composed of aldermen, and at the first meeting in each year was required to elect from its members a president and vice president. By chapter 90, Sp. Laws 1875, entitled "An act in relation to assessments for taxes in the county of Ramsey," it was provided that the chairman of the board of county commissioners (ex officio the mayor of the city), the county auditor, and the president of the common council, were constituted a board whose duty it was,

on the tenth of March of each alternative year, to appoint a county assessor for the term of two years. By chapter 6, Sp. Laws 1891 (known as the Bell charter), the single body theretofore known as the common council was abrogated, and there were substituted in its place two separate legislative branches, one designated the board of aldermen, and the other the assembly, each to meet separately, and each to elect its own presiding officer. These two bodies met in joint session for special purposes, and were designated as the common council of the city of St. Paul; but the law contained no provision for the election of a president of the common council. It did, however, provide that the president of the assembly should, ex officio, thereafter exercise certain duties and powers formerly imposed upon the president of the common council.

In 1900 the city adopted the so-called "home rule charter," which contained the dual form of government, and provided that the common council, acting in joint session, elect a president and a vice president. The purposes for which the common council shall sit in joint session are enumerated, and consist of the election of certain city officers, receiving bids for printing, and canvassing the returns of election, and some other matters, but no legislative functions are vested in this body acting jointly. The president is vested with the power of calling special meetings of the joint body, and is the acting mayor in case of absence or inability of the mayor. This charter includes the provision that the president of the common council, together with the county auditor, and the chairman of the board of county commissioners, shall appoint the assessor, as provided by the act of 1875.

The office of president of the common council, as created by the charter of 1874, was abolished by chapter 6, Sp. Laws 1891. State v. Johnstone, 61 Minn. 56, 63 N. W. 176. Under the old charter the president of the common council was the presiding officer of a single legislative body; whereas, under the so-called Bell charter, the two branches of the common council sitting jointly were not, strictly speaking, engaged in actual legislation. No doubt this distinction was given considerable weight in the Johnstone case, but it was probably not the controlling feature. Under the dual system of government, each body elected its own presiding officer, and the president

of the assembly was ex officio president of the common council when sitting in joint session. We are not disposed to question the conclusion reached by the court in that case, but the reasoning should not be extended and applied to the home rule charter.

Although the general features of a dual body for legislative purposes were retained in the home rule charter, a number of changes were made with reference to the joint action of the two branches when not engaged in strictly legislative business. Under the charter of 1874 the common council, acting as one body, were judges of the election of its own members, elected a city clerk, appointed and removed certain officers, elected a city printer, and elected members to represent the city on the board of equalization, and at the first meeting in each year a president and a vice president thereof were elected. The Bell charter repealed the last provision, and the duties of the presiding officer of the joint body devolved upon the president of the assembly. This was a radical change, for, as held in the Johnstone case, it amounted to an abolition of the office of president of the common council. But another radical change was effected in 1900. The main features of the Bell charter were retained, the common council consisting of two branches each having its president and sitting in joint session for special purposes only; but the office of president of the common council was restored. Section 4, c. 4, Charter of 1900, reads: "On the first Tuesday of June, or as soon thereafter as practicable, each body of the common council shall proceed to elect by ballot, from its own body, a president and vice president, and the common council acting in joint session shall elect a president and vice president. Each of said presidents shall preside over the meetings of the body from which he is elected. * * *" It was also provided (section 5) that: "During the absence of the mayor from the city, or in case of his death, inability or incapacity for any reason to discharge the duties of his office, the president of the common council shall exercise all the powers and discharge all the duties of the mayor, and shall be styled acting mayor of St. Paul."

The office of president of the common council is specifically created, the duties designated, and it is clear that it was the intention to restore the office. True, the joint body over which that officer presides does

not engage in legislation, strictly speaking; but, so far as the application of the act of 1875 is concerned, we believe that fact is not important. The duties of the office and of the joint body may be changed, without obliterating the office of president. It is hardly reasonable that the president of the common council was designated in the 1875 act as a member of the appointing board simply because of the nature of his duties, or because the body over which that officer presided was vested with legislative power. Any other city official might have been designated, but presumably the president of the council was selected, for the reason that the position was of some prominence. We are of opinion that the office of president of the common council, as contemplated by the act of 1875, was restored by the home rule charter.

The next question is whether the act of 1875 became self-operative upon the restoration of that office, so that, without any other legislative expression, the president was authorized to participate in the appointment of an assessor.

Section 1, c. 17, of the home rule charter, contained the provision that the chairman of the county commissioners, and the county auditor, together with the president of the common council should constitute a board of appointment for the purpose of appointing an assessor, and it has been suggested that this was sufficient to set the act of 1875 in motion. If such was the purpose of introducing this provision, it is attacked upon the ground that it is special legislation and prohibited by the constitution. Whatever may have been the purpose of inserting this provision in the home rule charter, it certainly could not have had the effect of creating the appointing board, nor of amending the act of 1875. State v. Johnstone, supra. While the office of president of the common council existed, that officer, by virtue of his office, was a member of the appointing board. During the interregnum of the Bell charter, the act of 1875 was not repealed or amended, but was in full force and effect, except that there was no president of the common council to participate as a member of the appointing board. Upon the recreation of that office, however, the 1875 act became self-operating without any other legislative act.

There are probably no authorities directly in point. Certain anal-

ogies illustrate the principle which controls. For instance, a general law becomes self-operating which had been superseded by temporary special legislation. Pushor v. Village of Morris, 53 Minn. 325, 55 N. W. 143; Heinssen v. State, 14 Colo. 228, 23 Pac. 995. A special act, creating an office with a salary, is only in suspense during the time the salary is provided for by the general appropriation act. State v. Burdick, 4 Wyo. 272, 33 Pac. 125, 24 L.R.A. 266. The 1875 act was not in complete suspension; but it could not become effective as to the president of the common council for the reason that there was no such officer. The result was the same as though the common council had, for some reason, failed to elect a president for one year, or longer, or if, for any reason, the president had been unable to attend the meetings of the appointing board.

Affirmed.